308 Ga. 194
FINAL COPY

S19A1580. KILPATRICK v. THE STATE.

BENHAM, Justice.

Appellant Charles Richard Kilpatrick, Jr., appeals his convictions related to the shooting death of Joseph Henry Wilder.[1] For the reasons set forth below, we affirm.

Viewed in a light most favorable to upholding the jury's verdicts of guilty, the trial record shows as follows. On August 7, 1998, Appellant and Wilder were driving westbound on I-20 in their respective vehicles near the Thornton Road exit in Douglas County.

---

[1] The crimes occurred on August 7, 1998. On October 28, 2016, a Douglas County grand jury indicted Appellant on charges of malice murder, felony murder, and two counts of aggravated assault. Appellant was tried before a jury from November 27 to December 7, 2017. The jury returned verdicts of guilty on all charges, and the trial court sentenced Appellant to serve life in prison for malice murder. The felony murder count was vacated as a matter of law, and the aggravated assault charges merged into the malice murder count for sentencing purposes. Appellant moved for a new trial on December 7, 2017, and amended the motion for new trial on February 28, 2019. The trial court heard the motion for new trial as amended on March 7, 2019, and denied it on March 27. On April 16, 2019, Appellant filed a notice of appeal. Upon receipt of the record from the trial court, the appeal was docketed to the August 2019 term of this Court and submitted for decision on the briefs.

Appellant's friend, Marcuss Herndon, was a passenger in Appellant's vehicle.[2]

Witnesses testified that Appellant's and Wilder's vehicles were bumping into each other on the highway. Appellant and Herndon testified that Wilder's vehicle hit the rear of Appellant's vehicle twice. The two vehicles ultimately ended up stopped in the emergency lane with Wilder's vehicle, which was a maroon SUV, parked behind Appellant's vehicle, which was a dark-colored truck. Witnesses stated they saw Appellant, who was positioned behind the back of his truck and in front of Wilder's forward-facing SUV, point a gun at and fire it several times into Wilder's vehicle, all while calmly walking backwards toward his truck. Herndon, who remained in the passenger seat of Appellant's vehicle, testified that he heard gunshots, but that he did not actually see the shooting. Appellant reentered his vehicle and drove away.

Passing motorists, who saw the shooting from the road and

---

[2] Herndon testified that Appellant was driving him home that night after the two had spent the afternoon playing golf. The two had made several stops along the way, including stopping so Appellant could buy marijuana.

then circled back to the scene, stopped to check on Wilder, who was deceased. The doors to Wilder's vehicle were locked, suggesting he remained inside his vehicle during the shooting. The driver's side window of Wilder's vehicle was shot out and there was a bullet hole through the front windshield. Wilder sustained seven bullet wounds to his chest and abdomen. The passing motorists, who stopped to check on Wilder, told police that they did not see a firearm inside Wilder's vehicle or on his body. Police did not find a firearm on or near Wilder. At the scene, investigators collected six .45-caliber shell casings which were later determined by a ballistics expert to have been fired from the same .45-caliber firearm possibly made by several manufacturers, including Llama.

The case went cold for almost two decades until the investigation was renewed in 2015 when the girlfriend of Appellant's brother, Jeff Kilpatrick, came forward to police with information about Wilder's death. As part of the renewed investigation, the police obtained warrants to tap the mobile phone numbers of Appellant and his brother Jeff. In addition, the police

3

sent a fabricated news article[3] to Appellant and Jeff in order to elicit inculpatory information about Wilder's murder while the brothers were subject to the wiretap warrants. During the renewed investigation, the police were also able to match a bumper left at the crime scene in 1998 to the vehicle Appellant drove in 1998, which vehicle Appellant had sold in 2000 and which authorities were able to locate in Missouri with its most recent owner. Based on the wiretaps and other evidence revealed by the renewed and prior investigations, police arrested Appellant.

Immediately after his arrest, Appellant told police he shot Wilder in self-defense. At trial, Appellant testified that he used his .45-caliber Llama handgun to shoot at Wilder.[4] He testified that upon pulling over on the side of the road into the emergency lane,

---

[3] The fabricated news article generally stated that new technology was helping authorities solve Wilder's cold case. The article featured a real picture of appellant's truck, a 1998 sketch of the suspect based on descriptions from passing motorists who saw the shooting that night, and an age-progression sketch based on Jeff's driver's license photo.

[4] Jeff testified that, soon after the shooting, Appellant gave the gun to their father, who was deceased by the time of trial. The State introduced evidence showing that, on October 10, 1998, their father made a report to the Cobb County Police Department that the gun had been stolen.

Wilder exited his vehicle, pulled out a gun, and began running toward appellant's truck. Appellant, who was still inside his truck, testified he drove further down the highway, and pulled over into the emergency lane a second time. At that point, he exited his vehicle and put his gun, which he usually kept in his truck, inside his pocket. Appellant testified he intended to inspect the damage to his truck; however, Wilder drove up once again and sped towards him. Appellant testified that he believed Wilder was going to hit him with his SUV, but Wilder stopped the vehicle before reaching Appellant. Appellant testified that he next saw Wilder start to reach for something, so Appellant pulled out his gun and fired it at Wilder. Appellant testified he was in fear for his life such that he felt compelled to shoot Wilder. Appellant admitted, however, that Wilder never shot at him and that Wilder's vehicle was fully stopped before appellant opened fire.

1. Appellant challenges the sufficiency of the evidence by arguing that the State failed to meet its burden of disproving his defense of justification.

5

> To establish justification for killing another, a defendant must show the circumstances were such as to excite the fears of a reasonable person that his safety was in danger. It is for the jury to decide whether the circumstances were sufficient to justify the existence of such reasonable fear and to accept a defendant's claim of self-defense.

(Citations and punctuation omitted.) *Howard v. State*, 298 Ga. 396 (1) (782 SE2d 255) (2016). See also *Stroud v. State*, 301 Ga. 807 (I) (804 SE2d 418) (2017). Here, the jury considered evidence in support of appellant's justification defense, namely Appellant's direct testimony at trial, as well as the State's evidence. The jury was free to reject Appellant's claim that he acted in self-defense. *Howard*, 298 Ga. at 398. The evidence, as described above, was otherwise sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Appellant was guilty of the crime for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Appellant alleges the trial court erred when it granted the State's motion in limine to exclude his expert witness. Before trial, appellant submitted the expert's resume, a single-paragraph

statement summarizing the expert's proposed testimony,[5] and a few graphs appearing to show the trajectory of the bullets that killed Wilder. The trial court refused to allow the expert to testify because it did not believe the expert's testimony would be helpful to the jury. There was no abuse of discretion.

> [E]xpert testimony is admissible where the expert's conclusion is beyond the ken of the average layman. But where jurors can take the same elements and constituent factors which guide the expert to his conclusions and from them alone make an equally intelligent judgment of their own, then expert opinion testimony is not admissible.

(Citation and punctuation omitted.) *Mosby v. State*, 300 Ga. 450 (2) (796 SE2d 277) (2017).[6] See also *Weems v. State*, 268 Ga. 142 (3)

---

[5] The expert's summary provided in pertinent part:
I will provide testimony . . . on matters pertaining to the use of force, fight-flight-freeze responses, and human physiology during high stress and life threatening situations. I will share my knowledge of the above areas in relation to the evidence found at the scene of the incident and witness statements regarding the event.

[6] It must be noted that
[a]lthough Georgia's [current] Evidence Code is applicable to the trial of this case, the evidentiary requirements relating to the admissibility of expert opinion testimony in a criminal case under the current Evidence Code (OCGA § 24-7-707) are nearly identical to those that applied under the former Evidence Code (OCGA § 24-9-67). Accordingly, it is appropriate to rely, as we do in this case,

7

(485 SE2d 767) (1997). Here, it was not beyond the ken of the jury to determine whether Appellant was justified in shooting Wilder given the evidence presented at trial.[7] Accordingly, this allegation of error cannot be sustained.

3. Appellant contends the trial court erred when it excluded evidence that Wilder was a member of a motorcycle gang. Appellant argues that because he learned of Wilder's membership in a gang days after the shooting, the evidence should have been admitted at trial so that he could explain to the jury his longtime failure to come forward before his arrest. The trial court excluded the evidence because it was irrelevant to Appellant's justification defense inasmuch as the two men did not know each other at the time of the shooting, and because the trial court believed the defense was prohibited from commenting on the reasons why Appellant failed to

---

on decisions under the old Code.
(Citation omitted.) *Mosby*, at 453, n. 2.

[7] For example, at the motion for new trial hearing, the expert testified that the "shooter" was moving away from Wilder's vehicle, or "the perceived threat," and toward his own vehicle while shooting. This is the same information the lay witnesses, who saw the shooting, provided to the jury when they testified that Appellant walked calmly backwards toward his truck while shooting at Wilder's vehicle.

come forward prior to his arrest.

We agree that the victim's alleged membership in a motorcycle gang, unknown to Appellant at the time of the shooting, was not relevant or admissible as to Appellant's justification defense and so the trial court did not err in that respect. See OCGA §§ 24-4-402, 24-4-404 (a). However, with the adoption of the current Evidence Code, there is no longer a categorical rule against the prosecution's admitting evidence of a defendant's pre-arrest silence or failure to come forward. See *State v. Orr*, 305 Ga. 729 (3) (827 SE2d 892) (2019).[8] The defense has never been precluded from introducing such evidence. Accordingly, the trial court was not required to exclude the evidence merely because the defense wanted to use it to explain Appellant's longtime failure to come forward. However, any error was harmless.

A non-constitutional error is harmless if it is highly probable

---

[8] Thus, when considering whether evidence of a defendant's silence or failure to come forward should be admitted, "careful attention must now be paid to the specific evidence offered and the specific theory and rules the proponent of that evidence contends authorize its admission." *Orr* at 741.

that the error did not contribute to the verdict. See *Rammage v. State*, 307 Ga. __ (5) (__ SE2d __) (2020). To determine whether a trial court error is harmless, we review the record de novo and weigh the evidence as a reasonable juror would. Here, Appellant admitted he shot Wilder, who was a stranger to him at that moment in time. The evidence also showed that the victim was unarmed. It is highly probable that the admission of Wilder's alleged gang affiliation would not have contributed to the jury's verdict on the murder charge. Therefore, this allegation of error fails.

4. Next, Appellant alleges the trial court erred when it overruled his objection as to the sufficiency of the identification of the voices heard on certain wiretap recordings. OCGA § 24-9-901 ("Rule 901") provides in pertinent part:

> (a) The requirement of authentication or identification as a condition precedent to admissibility shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
> (b) By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Code section:

. . .

> (5) Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon *hearing the voice at any time under circumstances connecting it with the alleged speaker*[.]

(Emphasis supplied.) Contrary to Appellant's assertions, the State met the requirements of Rule 901.

Here, the State presented evidence that investigators sought and obtained wiretap warrants for the phone numbers of Appellant and his brother, Jeff, allowing authorities to monitor and record their phone calls with each other and various other people. The lead investigator, Ken Aycock, testified about the steps taken to identify and verify the target phone numbers, the process of monitoring the phone calls, and the procedures used to discern whether the recorded calls were pertinent to the investigation of Wilder's murder. While Investigator Aycock was on direct examination, the State introduced and played wiretap recordings of certain conversations allegedly between Appellant and his other brother, Jason Kilpatrick, and a conversation allegedly between Appellant

11

and Herndon. Investigator Aycock testified that he was able to recognize and distinguish the voices on the recordings because he had interviewed those individuals personally.[9] See *United States v. Ross*, 686 Fed. Appx. 691, 693 (11th Cir. 2017) ("[A]n officer's testimony that he became familiar with the defendant's voice during the wiretap surveillance was sufficient to satisfy the requirements of Rule 901 (b) (5) [of the Federal Rules of Evidence].").[10] This was sufficient identification of the voices to admit the recordings into evidence at trial. Id.; OCGA § 24-9-901 (b) (5).

5. Appellant alleges the trial court erred when it denied his motion for mistrial based on the admission of improper character evidence.[11] At the pretrial motion hearing, Appellant did not object

___

[9] For example, Investigator Aycock identified Appellant as having a deeper voice than his brother Jason, whom he described as having the higher-pitched voice.

[10] We look to the decisions of the United States Court of Appeals for the Eleventh Circuit when we interpret the rules of our current Evidence Code that are materially identical to the Federal Rules of Evidence. See *Orr*, 305 Ga. at 736.

[11] The evidence in question concerned a wiretap recording of a conversation between Jeff and Appellant. The conversation occurred after Jeff and Appellant had received the fabricated news article about the crime. The two men generally discussed whether Appellant was going to submit to an

12

to any of the wiretap recordings based on the implication of bad character, but rather posited objections on other grounds. When the transcript of the recording at issue was admitted into the record at trial, appellant renewed his same pretrial objections, which the trial court overruled. After Investigator Aycock testified for some time about how the above-referenced conversation fit into the overall timeline of events, appellant moved for a mistrial, arguing that the statements improperly placed his character into evidence. The trial court denied the motion.

Any error was not properly preserved for review. Specifically, Appellant did not move for a mistrial, or otherwise object, on character grounds until *after* the transcript of the specific phone call had been admitted at trial, and *after* the investigator testified about how the call fit into the overall timing of events. Because the motion

---

interview at the request of an investigator from the Douglas County Sheriff's Office. During the conversation, Jeff speculated about why police wanted to talk to Appellant about an 18-year-old case and stated his belief that "enemies" from their past may be setting them up. To that end, Jeff made statements such that he and Appellant had "wild and crazy lives," that they had "made a lot of enemies and sh**," had a lot of "old buddies" who were "still junkies," and that he and Appellant had "been crazy since '82."

for mistrial was not contemporaneously made, the mistrial issue was waived for purposes of appeal. See *Coley v. State*, 305 Ga. 658 (3) (827 SE2d 241) (2019); *Jackson v. State*, 306 Ga. 266 (4) (830 SE2d 99) (2019).

6. Appellant asserts the trial court erred when it failed to suppress video-recorded statements Appellant made post-arrest and prior to receiving *Miranda*[12] warnings. This Court has explained that

> *Miranda* establishes a prophylactic rule which applies only to an accused's custodial statement which is made during interrogation. The issue of whether a statement was the result of an interrogation or was instead volunteered is a determination of fact for the trial court, and it will not be disturbed unless it is clearly erroneous.

(Citations, punctuation and emphasis omitted.) *Cope v. State*, 304 Ga. 1 (2) (816 SE2d 41) (2018). Interrogation for the purpose of *Miranda* includes questions, words, or actions that are reasonably likely to elicit an incriminating response. See *Johnson v. State*, 301 Ga. 707 (III) (804 SE2d 38) (2017). Our de novo review of the video-

---

[12] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

recorded custodial statement[13] supports the trial court's conclusion that Appellant's pre-*Miranda* statements were admissible.

In the video, Investigator Aycock told appellant that he wanted to ask Appellant some basic questions and talk about what happened in 1998. He also told Appellant he had already spoken with Appellant's wife and Herndon. At that point, Appellant told Investigator Aycock that he had been advised not to talk, and then stated, "You haven't read me my rights." Appellant immediately followed that statement with a question to Investigator Aycock as to whether he was being charged. Investigator Aycock responded affirmatively that Appellant was being charged, and assured Appellant that he would be reading Appellant "his rights" before asking any questions. Appellant then stated that he would "love to tell [Investigator Aycock] exactly what happened." Investigator Aycock did not respond to this statement, but rather turned his attention to some paperwork. Then, without any questioning or prompting from Investigator Aycock, Appellant said that he shot the

---

[13] See *Drake v. State*, 296 Ga. 286 (2) (766 SE2d 447) (2014).

15

victim in self-defense, proceeding to give his version of the night's events. Investigator Aycock sat listening to Appellant until Appellant invoked his right to counsel, at which point the recording stopped.

The video recording shows that Appellant was not being interrogated when he made his pre-*Miranda* statements. *Cope*, 304 Ga. at 4. Investigator Aycock did not respond to Appellant's statement about wanting to tell what happened, but was completing paperwork. It is clear that, rather than waiting for his rights to be read, Appellant expressed his desire to talk and then started talking of his own accord. Appellant's pre-*Miranda* statements were voluntarily and spontaneously uttered and, therefore, properly admitted at trial. Id.

7. Appellant alleges trial counsel rendered constitutionally ineffective assistance when he failed to object to the wiretap recordings on the grounds that there was no probable cause or necessity for the warrant application, and when he failed to take the necessary steps to ensure that Appellant's expert testified at trial.

16

To succeed on these ineffective assistance of counsel claims, Appellant must satisfy both prongs of the *Strickland v. Washington* test. *Strickland v. Washington*, 466 U. S. 668 (III) (104 SCt 2052, 80 LE2d 674) (1984). First, Appellant must show counsel's performance was deficient by showing counsel made errors so serious that he was not functioning as the "counsel" guaranteed to him by the Sixth Amendment. See id. "[Appellant] must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct." *Domingues v. State*, 277 Ga. 373 (2) (589 SE2d 102) (2003). Second, Appellant must show the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious that they likely affected the outcome of the trial. See id.

Because Appellant must satisfy both prongs, this Court does not need to "approach the inquiry in the same order or even to address both components of the inquiry if [Appellant] makes an insufficient showing on one." *Strickland*, 466 U. S. at 697. The trial court's factual findings and credibility determinations are reviewed

17

under a clearly erroneous standard, but this Court will independently apply the legal principles to the facts. See *Suggs v. State*, 272 Ga. 85 (4) (526 SE2d 347) (2000).

We address each allegation of ineffective assistance below.

(a) *Wiretap Recordings*

The trial court held a pretrial hearing to determine the admissibility of the wiretap recordings. Trial counsel objected to the wiretap recordings on several grounds and was partially successful when the trial court excluded the wiretap recordings that were made after Appellant's arrest. Trial counsel did not challenge the validity of the affidavit used to apply for and secure the wiretap orders. On appeal, Appellant contends trial counsel rendered constitutionally ineffective assistance for failing to seek exclusion of the wiretap recordings by challenging the sufficiency of the affidavit used to procure the wiretap warrants on the grounds that there was a lack of probable cause and necessity for the warrants. See OCGA § 16-

11-64 (c);[14] 18 USC § 2518 (3).[15]

At the motion for new trial hearing, trial counsel testified that he believed that the process of how law enforcement procured the warrants was "something the jury should hear about." Trial counsel

---

[14] OCGA § 16-11-64 (c) provides in pertinent part:

Upon written application, under oath, of the district attorney having jurisdiction over prosecution of the crime under investigation or the Attorney General made before a judge of superior court having jurisdiction over the crime under investigation, such court may issue an investigation warrant permitting the use of a device for the surveillance of a person or place to the extent the same is consistent with and subject to the terms, conditions, and procedures provided for by 18 U.S.C. Chapter 119. Such warrant shall have state-wide application and interception of communications shall be permitted in any location in this state.

[15] 18 USC § 2518 (3) provides in pertinent part:

(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting . . ., if the judge determines on the basis of the facts submitted by the applicant that[ ]

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]

testified that he attempted to cross-examine Investigator Aycock about how the warrants were obtained but that he was not allowed to pursue that line of questioning because the trial court sustained an objection from the State. Trial counsel did not otherwise opine as to why he did not pursue a pretrial challenge to the wiretap affidavit on the grounds of lack of probable cause and necessity.

When and how to raise objections to evidence at trial is generally a matter of trial strategy. See *Gibson v. State*, 272 Ga. 801 (4) (537 SE2d 72) (2000). Neither the fact that counsel could have pursued a different strategy to suppress the wiretap evidence nor the fact that his chosen strategy was partially unsuccessful necessarily renders his performance constitutionally deficient. See *Leili v. State*, 307 Ga. 339 (4) (834 SE2d 847) (2019). Trial counsel sought to have certain wiretap recordings excluded, and, through his efforts, he successfully ensured that no post-arrest wiretap recordings would be admitted at trial. He did not challenge the sufficiency of the affidavit. Appellant has not made a showing on appeal that the affidavit was insufficient to secure the wiretap

warrants, but rather relies on blanket assertions that there was no probable cause or necessity to procure the warrants. However, the affidavit, which was entered as an exhibit at the motion for new trial hearing, complies with OCGA § 16-11-64 and 18 USC § 2518 (3).[16] Counsel was not deficient for failing to make a meritless objection. See *Walker v. State*, 306 Ga. 637 (2) (832 SE2d 783) (2019).

(b) *Expert Witness.*

The trial court denied testimony from appellant's expert on the ground that it would not be helpful to the jury. See Division 2, supra. Even with this determination, the trial court offered

---

[16] The 37-page affidavit thoroughly sets forth the scope of the 1998 investigation and the renewed investigation, making it clear that there was probable cause to believe Appellant and his brother Jeff were the key suspects in Wilder's murder. Although investigators strongly believed that Appellant shot the victim and that Jeff helped dispose of the murder weapon, the affidavit also noted that the 1998 sketch of the suspect, which was based on eyewitness descriptions of the shooter that night, somewhat favored Jeff's appearance at the time. Thus, investigators needed the wiretaps to clarify who should be arrested and for what charges. Authorities were also concerned that evidence would be lost or concealed further if they were not allowed to surreptitiously gather evidence. For example, police refrained from interviewing appellant's ex-wife for fear Appellant would become aware of the renewed investigation and take action to conceal the crime. The affidavit also described in detail how authorities planned to use the fabricated news article to elicit incriminating statements once the wiretaps were in place.

Appellant the opportunity to make an additional proffer, beyond the expert's resume and single-paragraph summation already submitted, in support of allowing the expert to testify. Trial counsel declined to make an additional proffer, proceeding to trial without an expert. According to appellant, trial counsel was deficient by failing to do everything he could to secure the expert's testimony at trial.

At the motion for new trial hearing, trial counsel testified that he did not believe making an additional proffer would have been "fruitful" and so he decided to "move on." As set forth in Division 2, supra, the trial court did not abuse its discretion when it excluded the expert's testimony. Accordingly, trial counsel was not deficient when he made no additional effort to have the expert testify. See *Walker v. State*, 294 Ga. 851 (4) (b) (757 SE2d 64) (2014) ("[F]ailure to pursue further a meritless argument does not constitute ineffective representation by counsel.").

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 28, 2020.
Murder. Douglas Superior Court. Before Judge Emerson.
*James K. Luttrell*, for appellant.
*Ryan R. Leonard, District Attorney, Sean A. Garrett, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B.*

*Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.