312 Ga. 405
FINAL COPY

S21A0862. WOODS v. THE STATE.

BOGGS, Presiding Justice.

After a 2013 jury trial, Alexander Woods III was convicted of five counts of malice murder and given five consecutive life sentences in connection with the 2004 shooting deaths of four members of the Resendez family and their housekeeper. Woods' motion for new trial was denied, and he appeals, enumerating nine alleged instances of ineffective assistance of trial counsel. For the reasons stated below, we vacate the trial court's order denying Woods' motion for new trial, and we remand the case for the trial court to rule in the first instance on the question of deficiency of trial counsel and related evidentiary issues.

On November 8, 2004, three of the Resendez children and their cousin arrived home from school to find the Resendez children's parents, Jaime and Katrina Resendez, shot to death in their home

just outside the city of Moultrie in Colquitt County. The children immediately left to seek help; sheriff's deputies and EMTs arrived and discovered a total of five victims in the house, including the family housekeeper, Katrina's mother, and the youngest Resendez child, a toddler.

The investigation by the Colquitt County Sheriff's Department and the GBI initially led to Jerry Johnny Thompson, who was involved in an extensive drug smuggling and dealing operation with Jaime, and Thompson's "muscle" or "enforcer," Anthony "Amp" Davis, as suspects.[1] In 2006, Thompson was indicted for the murders. In 2009, Thompson's girlfriend, Yvonne Wilma Stover, also was indicted. Then, on March 22, 2011, Woods was indicted on five counts of malice murder, five counts of felony murder, and five counts of aggravated assault. On November 21, 2011, Thompson pled guilty and was sentenced to life in prison on one murder count, with sentencing delayed on the four remaining counts pending his

---

[1] In January 2005, Davis was shot to death and his body set on fire; at the time of Woods' trial, that murder was unsolved, and the record contains no further information about it.

testimony at Woods' trial. Stover's indictment remained pending at the time of the trial.

I. *The evidence presented at trial.*

Woods was tried before a jury from May 6 to 10, 2013. At trial, Thompson was the principal witness for the State and the only witness to identify Woods directly as a participant in the crimes. Thompson told the jury the following. Jaime was transporting marijuana from Texas to Georgia for their supplier, Hector Valdez. After several shipments were intercepted and seized by law enforcement, resulting in Jaime's owing large sums of money to Valdez, Jaime stopped communicating with Valdez. Valdez instructed Thompson to contact Jaime and convince him to call Valdez, and Thompson planned to scare Jaime into calling Valdez by sending Davis over to the house to threaten him. Thompson contacted Davis, who told him he would need to bring his "homeboy" with him to confront Jaime.

Thompson and Stover met Davis and his "homeboy," whom Thompson identified as Woods, at a gas station near the Resendez

3

home on the morning of the murders. Thompson did not know Woods, but he later gave a description of Davis' "homeboy" to the police, assisted a forensic artist in preparing a sketch, and later identified Woods in a lineup.[2] Thompson gave the two men a bag with two bullet-proof vests, an AK automatic rifle, and a Lorcin pistol; led them to the Resendez house; and left them there.

Shortly afterward, Davis called Thompson and told him to come back, telling him "there's trouble . . . get back right now." Thompson returned to the house while Stover remained in the car, and found Jaime lying on the floor, shot dead. Woods was "acting crazy," dragging the family's housekeeper by her hair and holding a pistol to her head, asking her "where the money's at, where's the money at." Thompson attempted to explain to Woods that dealers "don't keep money where we sleep," but Woods did not listen. Thompson also saw Woods take a distinctive gold necklace from Jaime's neck. Thompson contacted Stover by radio and instructed

---

[2] While Stover also testified for the State, she was unable to identify Woods as the man she saw with Davis.

4

her to leave. Shortly thereafter, Jaime's wife and her mother walked into the house, and Woods grabbed them and tried to get Thompson to translate to tell them where the money was. At that point, Thompson decided to leave and went outside to Davis' SUV.

Thompson entered the SUV and "waited for a second," and then Davis and Woods came out and told Thompson to drive away. Woods asked Davis if he had collected all his bullets, and Davis said he had, and Woods said he had his. Then Davis said, "I wished you hadn't of did that to that baby," and Woods responded that the child was "going to grow up one day." Davis said that he took about $2,000 from the Resendez house and divided that money with Woods. After the men changed clothes at a nearby house, Thompson disposed of the firearms in a swampy area. Sheriff's deputies and GBI agents, led to the scene by Thompson, located a Kalashnikov AK-47 automatic rifle and a magazine for a Lorcin pistol there; the pistol itself was never found. Ballistic tests determined that a bullet and a bullet fragment found at the scene were fired from the recovered rifle and that other bullets and shell casings recovered at the scene

were fired from a Lorcin 9mm pistol.

Both Woods' sister and his girlfriend at the time testified that Woods did not have a car or a phone, and usually had very little money.[3] On the day of the murders, however, Woods had a large, unexplained amount of loose cash and gave some to his girlfriend to get her nails done. A friend of Woods testified that in August 2011, Woods called him and asked him to tell Woods' girlfriend to "get rid of that necklace" because that was "all they had on him." The State also introduced telephone records showing calls on the morning of the murders made between Thompson, Davis, and a telephone number associated with Woods.[4]

The jury returned a verdict of guilty on all counts, and on May

---

[3] The custodian of records for a local business testified that Woods had recently begun working for the company but had not received his first paycheck at the time of the murders.

[4] Woods did not have a telephone. The custodian of records for Woods' employer testified that Woods provided two contact telephone numbers on his employment application, including a telephone number later identified as Woods' girlfriend's mother's landline number. Woods' girlfriend and her mother testified that they did not place or receive the calls between that number, Thompson, and Davis on the morning of the murders. Woods' girlfriend further testified that Woods used the phone and that Davis had called that number in the past looking for Woods.

10, 2013, Woods was sentenced to serve five consecutive life terms in prison. On May 14, 2013, Thompson was sentenced to life imprisonment on the remaining four murder counts in his indictment, to run concurrently with the original life sentence imposed in 2011. In October 2013, Stover pled guilty to five counts of aggravated assault as a lesser included offense of felony murder and was sentenced to serve nine years of a 20-year sentence in prison, with the balance on probation, concurrently on all five counts.

2. *The motion for new trial.*

Woods filed a timely motion for new trial asserting numerous claims of error. He raised nine different instances of ineffective assistance of trial counsel, including counsel's alleged failure to adequately cross-examine the witnesses against him and to investigate or call exculpatory witnesses.[5] Among other claims,

---

[5] Woods' other allegations of ineffective assistance, which he also asserts on appeal, included counsel's failure to conduct an adequate cross-examination of Stover, failure to raise certain objections, and preemptive introduction of evidence of Woods' prior bad acts.

Woods asserted in his motion for new trial, and continues to assert on appeal, that his trial counsel were deficient in failing to use a wide range of materials to impeach or discredit Thompson, including the State's death penalty notice with respect to Thompson's indictment and the possibility of its withdrawal in exchange for Thompson's testimony; Thompson's alleged written and oral confessions to the murders that did not mention or identify Woods as a party to the crimes; his alleged prior inconsistent statements to investigators and others regarding the facts and circumstances of the murders; his apparent attempt to create an alibi for the time of Davis' murder; his alleged inconsistencies in his identification of Woods; his alleged pretrial attempts to influence Stover's testimony; and his prior alleged violence and threats of violence against various individuals, including Stover, a federal prosecutor, and others who testified or gave statements to investigators. Woods asserted in his motion for new trial that this evidence, especially when considered cumulatively, called Thompson's trial testimony into such question that the jury most likely would have rejected his testimony

8

altogether had counsel employed the evidence at trial, thus creating a reasonable probability of prejudice from counsel's deficiencies, particularly in light of the weakness of other evidentiary support for the verdicts.

At the 2019 hearing on Woods' motion for new trial, at which both of his trial counsel testified, Woods' appellate counsel examined trial counsel regarding witness statements, GBI investigatory reports, jail call records, and other documents pertaining to the initial investigation of Thompson in 2004 and 2005 ("the Thompson documents"). These documents, however, were never authenticated during the hearing. The State objected to the introduction of the Thompson documents not only because they were hearsay but also because they had not been authenticated. After some discussion, during which the State repeated its authentication argument, the trial court sustained the objection to the Thompson documents, but without specifying the basis for its decision.

Woods' trial attorneys were the only witnesses at the hearing, and both testified that they had never seen the Thompson

9

documents before; Woods' lead counsel ultimately testified that he did not believe the State ever produced the documents to the defense in discovery: "Well, here's the thing I'm having a problem with. You're asking questions about stuff that I don't know anything about. I don't remember all that being in the discovery." He reiterated this testimony throughout his examination, noting that much of this material would have been generated in the 2004 and 2005 investigation of the murder charges against Thompson, not the later investigation of Woods, and stating, "I can't answer a question about stuff I've never seen in my life."[6] Woods did not call any other

---

[6] Lead trial counsel testified: "[W]hat I'm trying to say is, when [Woods' file] got passed off to me from the public defender's office [that previously represented Woods], that [the Thompson documents] would not have been in it. That would have been in [Thompson's public defender]'s file up in Cordele. Not mine." And during cross-examination by the State at the hearing, this exchange occurred between Woods' lead trial counsel and the prosecutor:

> TRIAL COUNSEL: You heard my statement to his questions saying I do not recall that being in the discovery. This started out as a death-penalty case with Jerry Johnny Thompson, didn't it?
> PROSECUTOR: Correct.
> TRIAL COUNSEL: Isn't that where all those documents came from?
> PROSECUTOR: I would guess. I wasn't part of that.
> TRIAL COUNSEL: I wasn't part of that either. . . . I mean, I can't answer a question about stuff I've never seen in my life.

Woods' co-counsel at trial similarly testified that he reviewed the entire file and that "I just don't remember that in the discovery, sir."

witnesses, such as the trial prosecutor or a lead investigator with knowledge of the State's investigative files, to identify the Thompson documents or to establish whether they were produced to Woods' trial counsel, and Woods' counsel had no opportunity to cross-examine any witnesses regarding them.

In its order denying Woods' motion for new trial, the trial court pretermitted the question of whether counsel were constitutionally deficient, instead concluding only that Woods had failed to demonstrate prejudice and thus had failed to establish the second prong of the test under *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). The trial court also noted that, although it had excluded the Thompson documents at the hearing on Woods' motion for new trial, it "hereby reconsiders said ruling and admits the Defense exhibits 4 through 39 for the Motion for New Trial as the Court finds that the documents are not hearsay and shall be allowed to come into evidence for purposes of the Motion for New Trial." Again, however, the trial court made no ruling regarding the State's authentication objection.

11

3. *Analysis.*

(a) *Ineffective assistance of trial counsel.*

In his brief on appeal, Woods enumerates as error the claims of ineffective assistance of trial counsel raised in his motion for new trial. He also asserts cumulative prejudice under *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020).[7] To prevail on his claims of ineffective assistance, Woods must prove both that the performance of his lawyers was professionally deficient and that he was prejudiced by this deficient performance. See *Strickland*, 466 U. S. at 687 (III). To prove deficient performance, Woods must show that his attorneys "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). This requires that he "overcome the strong presumption that

---

[7] While Woods relies on *Lane* in his brief, that decision announced a new rule regarding the cumulative effect of a combination of certain *trial court errors* and deficiencies of counsel. See 308 Ga. at 17 (1). Woods enumerates no trial court error, arguing only the cumulative effect of multiple deficiencies on the part of his trial counsel, which has long been part of the *Strickland* analysis. See *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007), overruled on other grounds, *Lane*, 308 Ga. at 23 (Appx.).

counsel's performance fell within a wide range of reasonable professional conduct." (Citation and punctuation omitted.) *Marshall v. State*, 297 Ga. 445, 448 (2) (774 SE2d 675) (2015). And to prove prejudice, Woods "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B).

Ordinarily, "[f]ailure to satisfy either prong of the *Strickland* test is sufficient to defeat a claim of ineffective assistance, and it is not incumbent upon this Court to examine the other prong." (Citation and punctuation omitted.) *Smith v. State*, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015). However, this Court must also consider that "prejudice" is assessed based on the cumulative effect of all of trial counsel's deficiencies. *Debelbot v. State*, 305 Ga. 534, 544 (2) (826 SE2d 129) (2019). "[I]t is the prejudice arising from counsel's errors that is constitutionally relevant, not that each individual error by counsel should be considered in a vacuum." (Citation and

13

punctuation omitted.) *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007), overruled on other grounds, *Lane*, 308 Ga. at 23 (Appx.).

Here, the trial court assumed trial counsel's deficiency, concluding only that Woods had failed to show prejudice even if counsel was deficient in all the instances alleged. A trial court does not err in addressing only one prong of the *Strickland* test, provided that its determination that the defendant has failed to satisfy that prong is correct. See *Smith*, 296 Ga. at 733 (2). But here, by assuming deficiency, the trial court assumed that all of Woods' assertions with regard to the Thompson documents are true, including that they are authentic and were available to his trial counsel, and that trial counsel had no valid strategic reason not to use them for impeachment. And the trial court also assumed the validity of Woods' other claims of deficiency unrelated to the Thompson documents. In light of all these assumptions, Woods has shown prejudice, at least as a cumulative result of all the deficiencies he alleges, and the trial court therefore erred in

concluding otherwise.

"[W]hen we consider whether a defendant was prejudiced by the alleged deficiency of trial counsel, we measure the evidence that should have been — but was not — presented to the jury against the totality of the evidence that was presented." *Debelbot*, 305 Ga. at 543 (2). This requires us to consider the strength of the allegedly omitted evidence, its importance in the context of the trial, and the relative strength of the totality of the evidence.

First, as the only surviving eyewitness to the murders and the only person to identify Woods as a participant, Thompson was central to the State's case. Therefore, significant impeachment material in the Thompson documents that trial counsel deficiently failed to employ was likely to have affected the jury's evaluation of the State's principal witness, as well as the outcome of the trial. Cf. *Danforth v. Chapman*, 297 Ga. 29, 31 (2) (771 SE2d 886) (2015) (in context of analysis under *Brady* and *Giglio*,[8] when defendant's

---

[8] *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963), and *Giglio v. United States*, 405 U. S. 150, 153 (92 SCt 763, 31 LE2d 104) (1972).

15

cellmate was sole witness to testify that defendant confessed, undisclosed evidence impeaching witness' testimony was material to defense and created reasonable probability that outcome of trial would have been different).

Second, this would be a substantial amount of impeachment evidence that was not, but should have been, presented to the jury. For example, Thompson purportedly made oral and written confessions to the crimes that did not identify Woods as a participant. And evidence from the Thompson documents — such as Thompson's stated inability to identify Davis' companion, his repeated attempts to influence Stover's testimony, and his multiple statements regarding killing Jaime and others — could have been used to impeach by contradiction Thompson's positive identification of Woods at trial, his testimony that he did not attempt to influence Stover, and his testimony that he had never killed anyone. See OCGA § 24-6-621 ("A witness may be impeached by disproving the facts testified to by the witness."). And, as Woods correctly argues, the State's death penalty notice, assuming it remained pending at

16

the time of Thompson's testimony, would suggest that Thompson's testimony for the State was motivated by powerful self-interest.[9]

> [T]he partiality of a witness may be exposed by proof that he hopes to benefit in related cases from his cooperation with the prosecution in this case. Such partiality is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony.

(Citations and punctuation omitted.) *Kinsman v. State*, 259 Ga. 89, 91 (7) (b) (376 SE2d 845) (1989). The totality of the impeachment evidence would be strong, even without considering the other alleged deficiencies unrelated to the Thompson documents.

Third, we have declined to conclude that prejudice exists, even while assuming trial counsel's deficiency, when evidence of the appellant's guilt was "overwhelming" or "very strong." See, e.g., *Humphrey v. Riley*, 291 Ga. 534, 544-545 (II) (K) (731 SE2d 740) (2012) (combined effect of actual and assumed deficiencies did not

---

[9] As Woods notes, Thompson testified on cross-examination at trial that he already had been sentenced to "27 years federal time" and "five life sentences. What I say here can't help — ain't going to help me," claiming that the only reason he was "[c]oming in here and identifying [Woods] and telling the truth about what happened is because he killed a baby. Okay? And he don't need to go back out there in the world."

17

show a reasonable probability of different outcome, in light of overwhelming evidence of appellant's guilt); *Strother v. State*, 305 Ga. 838, 848-849 (5) (828 SE2d 327) (2019) (need not decide question of counsel's deficiency when evidence of appellant's guilt was "very strong"); see also *Parker v. State*, 309 Ga. 736, 745-747 (5) (848 SE2d 117) (2020) (no reasonable probability of different outcome even considering presumed harm from trial court error cumulatively with presumed prejudice from deficient performance of counsel, when evidence of guilt was "overwhelming"). But here, Thompson, an admitted accomplice whose testimony had to be corroborated, see OCGA § 24-14-8, was the only witness to identify Woods directly as a participant in the murders.[10] The evidence corroborating his testimony consisted only of Woods' possession of an unexplained amount of cash, a reference to a necklace that was never identified and never recovered, and telephone records showing calls between Davis and Thompson and a landline telephone used by Woods but owned and used by others. This additional evidence cannot be

---

[10] The trial court instructed the jury on accomplice corroboration.

18

considered "overwhelming" or even "very strong" in comparison to the testimony given by Thompson.[11]

> [A] prejudice determination is necessarily affected by the quantity and quality of the evidence that was presented to the jury and that which should have been, and a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

(Citation and punctuation omitted.) *Debelbot*, 305 Ga. at 543 (2).

For this Court to determine prejudice in the context of *Strickland*, we must "review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." (Citation and punctuation omitted.) *Swanson v. State*, 306 Ga. 153, 163 (2) (b) (829 SE2d 312) (2019).

The record shows a reasonable probability that the result of the

---

[11] Counsel for the State conceded at oral argument that, had the jury rejected Thompson's testimony, the remaining evidence would "probably not" have been sufficient for the State to obtain a conviction. Moreover, in its order denying Woods' motion for new trial, the trial court, in considering the quantum of evidence corroborating Thompson's accomplice testimony, observed, "While the Court agrees that this is not overwhelming direct evidence . . . , this testimony was slight evidence and that is all the law requires for corroboration and legal sufficiency." While this comment was made in a different context, it still suggests a "reasonable probability" that the remaining evidence, had the jury disbelieved Thompson's testimony, was not strong.

19

proceeding would have been different if counsel was in fact deficient in failing to use all of the Thompson documents in cross-examination, as well as deficient in the other ways alleged by Woods, and constitutes cumulative prejudice under *Strickland* and *Schofield*.[12] The question of trial counsel's deficiency therefore requires a determination of the authenticity and provenance of the Thompson documents, and allowing the parties to present testimony and evidence to explore fully any admissible documents. This must be addressed in the first instance by the trial court. See *Debelbot*, 305 Ga. at 541-542 (2) (in absence of necessary fact and credibility findings by trial court, this Court cannot undertake a *Strickland* analysis). We therefore vacate the trial court's order denying Woods' motion for new trial and remand for further findings as detailed below.

(b) *Authentication and related issues.*

On remand, the trial court must directly address the Thompson

---

[12] We express no opinion regarding whether the cumulative effect of fewer than *all* the alleged deficiencies would result in prejudice sufficient to meet the *Strickland* standard.

20

documents' authentication, admissibility, and pertinence to the alleged deficient performance of trial counsel — questions that are central to Woods' claims. In reversing its exclusion of the Thompson documents from the record, the trial concluded that "the documents are not hearsay." But it never considered the documents' authentication, an objection that was raised by the State at the hearing. Nor did the trial court consider the related questions of the whereabouts or custodian of the Thompson documents between the time of the State's investigation of Thompson and the time of Woods' prosecution; whether the documents were part of Woods' (as opposed to Thompson's) file; or whether they were provided to Woods' trial counsel. See generally *McDowell v. State*, 309 Ga. 504, 506-507 (2) (847 SE2d 309) (2020) (explaining authentication, including identification and chain of custody); *Kilpatrick v. State*, 308 Ga. 194, 198-199 (4) (839 SE2d 551) (2020) (authentication of phone records by testimony regarding procedures used by law enforcement to obtain them); see also *State v. Smith*, 299 Ga. 901, 902 (1) (792 SE2d 677) (2016) (trial court did not abuse discretion in excluding exhibit

21

when police investigator did not authenticate it). As noted above, these findings are likely to bear directly upon the question of trial counsel's deficiency, and potentially upon trial counsel's credibility, which the trial court must determine in the first instance. See *Gray v. State*, 309 Ga. 850, 855 (2) (b) (848 SE2d 870) (2020).[13]

(c) *Conclusion.*

We therefore vacate the trial court's order denying Woods' motion for new trial and remand for the trial court to hold a hearing, at which the parties may present evidence and argument, in order for the trial court to: (1) determine the admissibility of the Thompson documents, including their authenticity and provenance; (2) allow the parties to elicit testimony and make argument concerning such matters as whether those documents determined to be authentic and admissible were provided to Woods' trial counsel before the 2013 trial, and if so, why trial counsel did not use them;

---

[13] We note that Woods has not raised a claim that his trial counsel failed to properly investigate to find the Thompson documents or that the State suppressed the documents in violation of due process under *Brady* or *Giglio*. See generally *State v. Thomas*, 311 Ga. 407, 413-414 (3) (858 SE2d 52) (2021).

(3) determine whether, in light of those findings, Woods' trial counsel were constitutionally deficient under *Strickland*; and (4) if trial counsel are held to have performed deficiently, including with respect to those allegations not related to the Thompson documents, make an appropriate prejudice analysis under *Strickland* and *Schofield*. The trial court shall enter an order making these rulings, which may then be appealed to this Court.[14]

*Judgment vacated and case remanded with direction. All the Justices concur.*

---

[14] Nothing said in this Court's opinion should be considered a prejudgment or statement of expectation regarding the merits of the issues to be determined by the trial court.

23

Decided August 24, 2021 — Reconsideration denied September 21, 2021.

Murder. Colquitt Superior Court. Before Judge Moulton, Senior Judge.

*Jason M. McLendon, Matthew K. Winchester*, for appellant.

*Bradfield M. Shealy, District Attorney, James B. Threlkeld, Michelle T. Harrison, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.