**WHOLE COURT**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**March 16, 2022**

# In the Court of Appeals of Georgia

A21A1769. MCNEIL v. THE STATE.

RICKMAN, Chief Judge.

After a jury trial, Dakota McNeil was convicted of aggravated sexual battery, rape, child molestation, and incest for acts committed against the victim, his niece. He filed a motion for new trial, which the trial court denied. On appeal, he argues that the trial court erred by denying his motion for new trial because the evidence was insufficient to support his conviction and he received ineffective assistance of trial counsel in several respects. We find no reversible error and affirm.

1. *Scope of the appellate record.*

As an initial matter, we address the scope of the record that we may consider in ruling on this appeal. We do this because the appellate briefs cite materials that are not part of the appellate record.

In his order denying McNeil's motion for new trial, the trial judge expressly stated that he did not consider certain records of the Department of Family and Children Services ("DFACS"), which were in the trial court's possession after an in camera review, because those records had not been tendered or admitted into evidence or otherwise made a part of the trial court's record. Nevertheless, McNeil asked the trial court to transmit the DFACS records to this Court on appeal. The State did not oppose McNeil's request, and so the trial court provided the DFACS records to the clerk of court and ordered that the clerk transmit them to this Court under seal, "along with the official record."

Although the DFACS records are part of the materials sent to us by the trial court, we still must determine their "relevancy for appeal purposes[.]" *McHugh Fuller Law Group v. PruittHealth-Toccoa*, 297 Ga. 94, 99 (2) n. 4 (772 SE2d 660) (2015). And on appeal we may "consider only the facts and evidence that were before the trial court when it ruled upon [McNeil's motion for new trial]." *Sherod v. State*, 334 Ga. App. 314, 315 n. 9 (779 SE2d 94) (2015). The trial court determined that the DFACS records were not part of the evidence that was before it at the time of its ruling; and, while McNeil has offered some criticism of the trial court's treatment of those

2

records,[1] he has not challenged on appeal that aspect of the trial court's ruling. Consequently, we cannot consider the DFACS records in deciding this appeal.[2] See *Bailey v. State*, 313 Ga. App. 824, 827 n. 1 (723 SE2d 55) (2012).

2. *Sufficiency of the evidence.*

"When a defendant challenges the sufficiency of the evidence supporting his criminal conviction, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation and punctuation omitted.) *Dunlap v. State*, 351 Ga. App. 685 (1) (832 SE2d 667) (2019) (quoting *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)).

So viewed, the evidence showed that at various times when the victim was between the ages of three and seven, she lived with her maternal grandparents. During much of that time, the victim was in the legal custody of DFACS and in the physical

---

[1] The only criticism of the trial court's treatment of the DFACS records that McNeil voices on appeal is the trial court's failure to provide the parties with copies of those records after the in camera review. He does not enumerate that failure as error.

[2] Consequently, we also cannot consider McNeil's allegation of ineffective assistance of trial counsel premised upon information contained in those records.

custody of either her grandparents or various foster parents. Many other members of the victim's extended family also lived in the grandparents' household at various times while the victim was there, including McNeil, who was the victim's uncle.

McNeil preyed upon children at the grandparent's home, which seemingly had a rotating door of children of various ages, with minimal adult supervision. The victim stated that McNeil began sexually abusing her before she reached the age of five, and did so on a regular and consistent basis.

Multiple witnesses testified that beginning when she was three or four years old, the victim would regularly "hump" and "grind" her vagina against her hands, stuffed animals, furniture of all kinds, and various men as she would actively seek to sit in their laps. At age four, the victim was referred to a private psychologist by a DFACS caseworker for exhibiting extreme behaviors consistent with childhood trauma and anxiety, including constant bed wetting, aggression, defiance, and anger. The victim described that the abuse always took place at night, and McNeil threatened to hurt her if she told anyone about it.

In early September 2012, when the victim was seven years old, her grandparents surrendered physical custody of her to DFCAS. A few days later, another member of the household, the victim's sixteen-year-old cousin, disclosed that

4

McNeil had sexually abused her in the grandparent's home. The cousin stated that the abuse began when she was five years old, continued "all the time" until she was 13-years-old, and always occurred at night when McNeil snuck into her bed. She also testified that McNeil threatened to hurt her if she told anyone. She claimed to be so scared of McNeil that she placed barriers in front of her bedroom door or "hop[ped] beds" to sleep with others, and that she finally disclosed the abuse after she began throwing up in her sister's bed out of fear of McNeil's impending arrival. The cousin's outcry was met with anger on the part of the victim's grandfather, who expressly stated that he did not believe the cousin, and it resulted in the cousin being returned to a group home upon the grandfather's insistence.

The cousin's disclosure was prompted by yet another incident in which McNeil had sexually molested a child at the grandparent's house. That child, a friend of the cousin, lived nearby and had sexual intercourse with McNeil when she was 14-years-old.

In 2012, the victim was subjected to a forensic interview associated with the cousin's disclosure. During that interview, she expressly denied that McNeil had inappropriately touched her.

By mid-2013, the victim was living with foster parents who adopted her the following year. In 2014, before her adoption was finalized, the victim had an emotional outburst during a Sunday school lesson on lying and keeping secrets. The outburst was atypical for the victim.

In May 2014, on the day she received her new birth certificate reflecting her adoption, the victim disclosed to her adoptive mother that McNeil had sexually abused her. She said that was why she had been upset during Sunday school. The victim told her adoptive mother, "he hurt me," and provided specific details about the abuse. The victim said that McNeil had threatened to hurt her if she told anyone. She further explained that she had not said anything earlier because, before she received her new birth certificate, she had been afraid she would have to return to her grandparents' house.

The next day the victim repeated that disclosure to her private psychologist, whom she had continued to see periodically since being referred by DFACS several years prior. The psychologist testified that the victim appeared relieved after making the disclosure, and opined that the timing of the outcry was "critical" in that the victim had a sense of safety and security with her new family.

The victim's adoptive mother reported the disclosure to law enforcement, and later in May 2014, the victim gave a second forensic interview with the same person who had interviewed her in 2012. In the second interview, the victim again repeated her disclosure. She stated that McNeil touched her genitals with his hands and penis, inserted his finger and penis into her vagina, and inserted his penis into her anus. He also made the victim touch his penis and anus. She also stated that she had been scared to disclose the abuse during her earlier interview in 2012 because she was afraid of McNeil.

Based on the victim's statements in the 2014 forensic interview, McNeil was arrested. After that disclosure, the victim's bed wetting stopped, her physical acting-out diminished, and her academic performance improved.

McNeil asserts that this evidence does not support his convictions, but he offers no meaningful argument for why the evidence was insufficient. We find that the evidence authorized the jury to find that McNeil was guilty of the crimes of which he was accused. See OCGA § 16-6-1 (a) (2) ("A person commits the offense of rape when he has carnal knowledge of . . . [a] female who is less than ten years of age. Carnal knowledge in rape occurs when there is any penetration of the female sex organ by the male sex organ."); OCGA § 16-6-4 (a) (1) ("A person commits the

7

offense of child molestation when such person . . . [d]oes any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person[.]"); OCGA § 16-6-22 (a) (6) ("A person commits the offense of incest when such person engages in sexual intercourse or sodomy . . . with a person whom he or she knows he or she is related to either by blood or by marriage as follows: . . . Uncle and niece or nephew of the whole blood or the half blood."); OCGA § 16-6-22.2 (b) ("A person commits the offense of aggravated sexual battery when he or she intentionally penetrates with a foreign object the sexual organ or anus of another person without the consent of that person.").

3. *Ineffective assistance of trial counsel.*

McNeil argues that he received ineffective assistance of trial counsel in several respects. Specifically, he argues that his trial counsel was ineffective for failing to secure an expert witness to challenge the reliability of the victim's disclosure that McNeil had sexually abused her; present evidence of the victim's allegedly false prior allegations of abuse; object to bolstering testimony by the lead investigator; and object to speculative testimony by the State's expert witness.

8

To prevail on his ineffective assistance of counsel claim, McNeil "must show both that his counsel's performance was deficient and that the deficient performance so prejudiced him that, but for the deficiency, there is a reasonable probability that the outcome of the trial would have been different." *Hagan v. State*, 353 Ga. App. 534, 536 (3) (839 SE2d 1) (2020) (citation and punctuation omitted); see *Jones v. State*, 359 Ga. App. 688, 691 (2) (859 SE2d 845) (2021) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.") (citation and punctuation omitted.) This is a difficult test to meet, and "[s]imply because a defendant has shown that his trial counsel performed deficiently does not lead to an automatic conclusion that he was prejudiced by counsel's deficient performance." (Citation and punctuation omitted.) *Snipes v. State*, 309 Ga. 785, 790 (3) (848 SE2d 417) (2020). *Snipes*, 309 Ga. at 790 (3). The failure to satisfy either prong of the test is fatal to a claim of ineffective assistance, and it is not incumbent on this Court to consider the other prong. See id. In our review of the trial court's ruling, "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012). We will address each of McNeil's arguments in turn.

9

(a) McNeil claims that his trial counsel was ineffective for failing to hire an expert witness in order to challenge the reliability of the victim's 2014 disclosure that he had sexually abused her. At the motion for new trial hearing, he presented expert testimony that there were flaws in the 2014 forensic interview in which the victim disclosed the abuse, particularly in light of the victim's earlier denial. The expert opined that the interviewer asked certain questions and engaged in certain behaviors that could have improperly cued the victim to make false allegations, and that certain statements made by the victim may have suggested coaching by her adoptive mother.

We need not consider whether trial counsel was deficient for failing to present expert testimony because even if we presume that counsel was deficient on that front, McNeil has not met his burden of proving that, but for that deficiency, there is a reasonable probability the outcome of his trial would have been different. See *Jones*, 359 Ga. App. at 691 (2).

When making this assessment, we must "measure the evidence that should have been—but was not—presented to the jury against the totality of the evidence that was presented." (Citation and punctuation omitted.) *Woods v. State*, 312 Ga. 405 (III) (1) (862 SE2d 526) (2021). "This requires us to consider the strength of the allegedly

10

omitted evidence, its importance in the context of the trial, and the relative strength of the totality of the evidence." (Citation and punctuation omitted.) Id.

At the motion for new trial hearing, McNeil's expert pointed to certain behaviors by the forensic interviewer that he opined could have improperly cued the victim into making false allegations. But such testimony at trial would have in no way undermined the admissible evidence of the victim's spontaneous statements in which she described McNeil's abuse to her adoptive mother and her psychologist, both of which were made before the allegedly flawed interview took place.

The expert also opined that certain words used by the victim in the forensic interview suggest that she may have been influenced or coached by her adoptive mother. But again, the victim's allegations of abuse were corroborated by other admissible evidence, including the behaviors she exhibited that were consistent with childhood trauma and abuse, e.g., bed wetting, anger, aggression, and "grinding." The commencement of those behaviors was consistent with the victim's recollection of when the abuse began, and the fact that the behaviors all but stopped upon the victim's disclosure is further substantiating evidence. The timing of her 2014 disclosure was explained by both the victim herself and the circumstances of her adoption. Moreover, the evidence presented by the other acts witnesses, particularly

that of the victim's cousin who experienced abuse that was strikingly similar to that of the victim, was strongly corroborative not just of the victim's allegations, but also of McNeil's identity as the perpetrator.

Balancing the relative weight of the evidence, we conclude that when compared to the totality of the evidence presented at trial—including the victim's spontaneous statements to her adoptive mother and her psychologist, her anger and sexualized behaviors consistent with childhood trauma and the timing of those behaviors, the timing of the victim's disclosure, and the notably similar other acts evidence that points to McNeil as the perpetrator—the strength of the omitted expert's testimony and its importance in the trial is relatively weak. We simply disagree with the dissent as to the degree to which the expert's testimony would have undermined the admissible trial evidence.

In sum, given the strong evidence in support of McNeil's guilt, it is not reasonably probable that the outcome of the trial would have been different but for his counsel's failure to present the expert testimony. See *Hood v. State*, 308 Ga. 784, 786-790 (2) (843 SE2d 555) (2020); *Kirkland v. State*, 334 Ga. App. 26, 36-37 (5) (c) (778 SE2d 42) (2015); see also *Robinson v. State*, 277 Ga. 75, 77 (2) (586 SE2d 313) (2003).

12

(b) McNeil contends that his trial counsel rendered ineffective assistance because he failed to call the victim's minor brother as a trial witness. The brother was approximately a year older than the victim, and the victim told both her adoptive mother and her psychologist that he had also "messed with her" sexually. The victim stated during her 2014 forensic interview that her brother, who was nine at that time, began touching her sometime after McNeil's abuse had begun.

During the motion for new trial hearing, the victim's brother denied having touched his sister inappropriately. McNeil contends that his trial counsel should have called the brother as a trial witness and presented his testimony as evidence that the victim had allegedly made prior false allegations of abuse.

McNeil's counsel was not asked and did not testify as to his reasons for declining to call the victim's minor brother during the motion for new trial hearing. "[I]n the absence of such testimony, we must presume that his counsel acted strategically." (Citation and punctuation omitted.) *King v. State*, 320 Ga. App. 90, 97 (4) (c) (ii) (739 SE2d 654) (2013).

Moreover, the victim's adoptive mother and her psychologist both testified about the victim's disclosure that her brother had touched her inappropriately, and the jury watched the victim's 2014 forensic interview in which she discussed it. Before

13

evidence of an allegedly false prior allegation can be admitted, "the trial court must make a threshold determination outside the presence of the jury that a reasonable probability of falsity exists."*Smith v. State*, 259 Ga. 135, 137 (377 SE2d 158) (1989), overruled in part by *State v. Burns*, 306 Ga. 117 (829 SE2d 367) (2019).[3] As set forth by the trial court, "[a] court would likely not find a reasonable probability of falsity based merely upon what the Defendant has presented—that [the brother] denies the accusation." See *Williams v. State*, 266 Ga. App. 578, 580 (1) (597 SE2d 621) (2004) ("Of course, the fact that an accused states that the accusation against him is false is hardly evidence sufficient to raise a reasonable probability of falsity.") (citation and punctuation omitted). Consequently, McNeil cannot show that he was prejudiced by trial counsel's failure to pursue a futile attempt to call the victim's brother as a witness. See *Burger v. State*, 323 Ga. App. 787, 789 (1) (748 SE2d 462) (2013).

(c) McNeil asserts his trial counsel was ineffective because he failed to object to improper bolstering and/or speculative testimony from the State's witnesses.

---

[3] There is dissension in this Court as to the impact that the Supreme Court's decision in *Burns* had on the trial court's extra-statutory threshold procedural of finding a reasonable probability of falsity. See *Vallejo v. State*, __ Ga. App. __ (865 SE2d 640) (2021). This case was tried prior to *Burns*; regardless, post-*Vallejo*, the threshold requirement that the trial court first find a reasonable probability of falsity remains intact unless or until the Supreme Court says otherwise. See id.

14

McNeil's trial counsel testified at the motion for new trial hearing that his failure to object to the testimony was not trial strategy.

(i) The lead detective, who observed both of the victim's forensic interviews but participated in neither, was questioned about his observations of the victim's demeanor during her first forensic interview. After describing that the victim became reserved and quiet when being questioned about the alleged abuse, the detective was asked what her demeanor indicated to him. The detective responded that, based upon his training and experience, he "felt like [the victim] was being deceptive about the sexual abuse that had occurred."[4]

It is well established that "[a] witness's credibility may not be bolstered by the opinion of another, even an expert, as to whether the witness is telling the truth. Credibility of a witness is a matter solely within the province of the jury." (Citation and punctuation omitted.) *Zerbarini v. State*, 359 Ga. App. 153, 163 (2) (855 SE2d 87) (2021); see OCGA § 24-6-620.

As held by the trial court, the challenged testimony amounted to an improper comment on the victim's credibility and was objectionable. See OCGA§ 24-6-620;

_____

[4] Although McNeil quotes additional trial testimony in his appellate brief, his corresponding argument pertains only to the language quoted above.

15

*Al-Attawy v. State*, 289 Ga. App. 570, 572-573 (1) (657 SE2d 552) (2008). By stating that he did not find the victim credible when she denied abuse by McNeil during the first forensic interview, the detective bolstered her later allegations of abuse during the second interview.

Nevertheless, McNeil has not shown that he was prejudiced by counsel's failure to object to the testimony. See *Zerbarini*, 359 Ga. App. at 163 (3) (recognizing that the effect of improper bolstering should be considered in the context of the totality of the evidence presented against a criminal defendant). Both of the victim's forensic interviews were played for the jury, and there was corroborating evidence supporting the victim's claims. Thus, "the State presented other evidence from which the jury could assess [the victim's] credibility," minimizing any prejudicial effect of [the witness's] . . . bolstering." *Zerbarini*, 359 Ga. App. at 164 (3) (a).

Moreover, the jurors were instructed that they alone must determine the credibility of the witnesses and that they were not required to accept the testimony of any witness, expert or otherwise. They were also charged that their "assessment of a trial witness's credibility may be affected by comparing or contrasting that testimony to statements or testimony of that same witness before the trial started," and it was for them "to decide whether there is a reasonable explanation for any inconsistency in a

16

witness's . . . statements." Finally, the trial court instructed that, "[a]s with all issues of witness credibility, you, the jury, must apply your common sense and reason to decide which testimony you believe and which testimony you will not believe." Thus, no reasonable possibility exists that the detective's bolstering statement affected the outcome of the trial. See *Al-Attawy*, 289 Ga. App. at 573 (1); see also *Chavez v. State*, 329 Ga. App. 207, 210 (1) (764 SE2d 447) (2014).

(ii) Later in the trial, the victim's psychologist testified that it was not uncommon, based on her experience as a psychologist and therapist, for victims of sex abuse to have more than one perpetrator. When asked to explain the reason for that, she responded:

> Well, I think there are several possibilities. I wonder in this case if [the victim's brother] had observed [McNeil] abusing [the victim] or knew of that somehow and felt that, oh, okay, I can do it, too. I don't know. I haven't talked with him. . . . I haven't had an opportunity to explore the reason for that, but . . . I have also wondered if he might himself have been abused. Because every child abuser that I've had experience with has been a victim before they became a perpetrator.

We agree that the challenged testimony was speculative and objectionable. See *Mitchell v. State*, 355 Ga. App. 7, 11 (2) (842 SE2d 322) (2020) ("Although an expert may testify to [her] opinion, when the basis of [her] opinion is given and it appears

17

that it is wholly speculative or conjectural, it must follow that [her] opinion is without foundation and has no probative value.") (citation and punctuation omitted).

But again, McNeil was not prejudiced by his counsel's failure to object to the testimony. The witness herself acknowledged the speculative nature of her testimony as she said it, explicitly noting that she was not aware of whether the brother had observed McNeil abusing the victim, that she had not spoken to the brother, and that she had not had the opportunity to explore whether he himself might have been abused. Thus, McNeil has not met his burden of proving that he was prejudiced by his counsel's failure to object to the challenged testimony. See *Percell v. State*, 346 Ga. App. 219, 226 (4) (c) (ii) (816 SE2d 344) (2018).

(d) Lastly, we consider the cumulative effect of prejudice resulting from any assumed deficiencies in counsel's performance. See *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020) ("[I]t is the prejudice arising from counsel's errors that is constitutionally relevant, not that each individual error by counsel should be considered in a vacuum.") (citation and punctuation omitted), Here, in light of the other evidence of McNeil's guilt, "the cumulative prejudice from any assumed deficiencies discussed in [Division 3] is insufficient to show a reasonable probability

18

that the results of the proceedings would have been different in the absence of the alleged deficiencies." (Citation and punctuation omitted.) *Mitchell v. State*, 308 Ga. 1, 9 (2) (f) (838 SE2d 820) (2020); see also *Thomas v. State*, 311 Ga. 706, 719 (3) (d) (859 SE2d 14) (2021). It follows that the trial court did not err by denying McNeil's motion for new trial.

*Judgment affirmed. Miller, P. J., Doyle, P. J., Dillard, P. J., and Mercier, Reese, Brown, Gobeil, Markle, Hodges, Pipkin and Pinson, JJ. concur. McFadden, P. J., concurs fully in Divisions 1 and 2, and dissents in Division 3. Senior Appellate Judge Herbert E. Phipps concurs fully in Divisions 1 and 2, and dissents in Division 3 in a separate writing. Barnes, P. J. concurs fully in Divisions 1 and 2, and joins with both McFadden, P. J., and Senior Appellate Judge Herbert E. Phipps in their dissents.*

# In the Court of Appeals of Georgia

A21A1769. MCNEIL v. THE STATE.

MCFADDEN, Presiding Judge, concurring in part and dissenting in part.

I would hold that McNeil received ineffective assistance of counsel. Trial counsel failed to secure an expert witness on forensic interviews. Appellate counsel did secure such a witness, and that witness testified at the new-trial hearing and challenged not only the forensic interview in which McNeil's niece, J. D., described being molested, but also her initial outcry, and the opinion testimony elicited by the prosecution to explain away J. D.'s exculpatory response in an earlier interview. In other words he challenged all of the prosecution evidence that bears directly on the crimes for which McNeil has been convicted. So we must "measure the evidence

20

[introduced at the new-trial hearing] against the totality of the evidence that was presented." *Woods v. State*, 312 Ga. 405, 411 (3) (a) (862 SE2d 526) (2021) (citation and punctuation omitted). The majority does not perform the analysis required under *Woods*, and to the limited extent it undertakes to do so, it misstates the facts.

So I would reverse the denial of McNeil's motion for new trial and dissent from Division 3 of the majority opinion. I agree that the evidence was sufficient, so I concur in Division 2. I also concur in Division 1, regarding the scope of the appellate record.

To demonstrate ineffective assistance of counsel, an appellant must make two showings: deficient performance and prejudice.

> Under the familiar test of *Strickland v. Washington,* [466 U.S. 668, 678 (III) (104 SCt 2052, 80 LE2d 674) (1984)], to prevail on a claim of ineffective assistance of counsel, the party asserting the claim must demonstrate both deficient performance of counsel and prejudice as a result of it. . . . [T]he showing of prejudice calls for a demonstration that a reasonable probability exists that, but for [trial] counsel's deficient performance, the outcome of the appeal would have been different.

*Gramiak v. Beasley*, 304 Ga. 512, 513 (I) (820 SE2d 50) (2018). That is a high bar. But McNeil has made those showings.

1. *Deficient performance.*

21

It is true that "[t]he selection of an expert witness is a 'paradigmatic example' of the type of strategic choice that, *when made after thorough investigation* of the law and facts, is 'virtually unchallengeable.'" *Davis v. State*, 342 Ga. App. 889, 896 (2) (806 SE2d 3) (2017) (citation omitted; emphasis supplied). Generally, whether to present expert opinion testimony, including testimony about how forensic interviews should be conducted, "is a matter of trial strategy which, if reasonable, cannot be the basis for a successful ineffective assistance of counsel claim." *Brown v. State*, 292 Ga. 454, 457 (2) (738 SE2d 591) (2013) (citation omitted). See also *Lawton v. State*, 340 Ga. App. 903, 904 (2) (798 SE2d 264) (2017); *Towry v. State*, 304 Ga. App. 139, 147 (2) (f) (695 SE2d 683) (2010).

Nevertheless, "expert testimony offered by the defense may be necessary in some circumstances to adequately challenge the [s]tate's experts." *Tezeno v. State*, 343 Ga. App. 623, 633 (2) (b) (808 SE2d 64) (2017). The standard we must apply in determining whether trial counsel's decision not to present expert testimony was reasonable strategy is set out in *Strickland v. Washington* itself and has been reaffirmed many times since.

> [S]trategic choices made after thorough investigation of law and facts
> relevant to plausible options are virtually unchallengeable; and *strategic*

*choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation*. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-691 (III) (A) (emphasis supplied). See also, e.g., *Poole v. State*, 291 Ga. 848, 858 (8) (734 SE2d 1) (2012); *Martin v. Barrett*, 279 Ga. 593, 593-594 (619 SE2d 656) (2005); *Douglas v. State*, 327 Ga. App. 792, 795 (2) (a) (761 SE2d 180) (2014).

We held that such testimony had been necessary in *Goldstein v. State*, 283 Ga. App. 1, 6-9 (3) (b) (640 SE2d 599) (2006). There trial counsel provided ineffective assistance, we held, by failing to present expert testimony to challenge opinions of the state's expert witnesses in a child molestation case. In support of his ineffective assistance claim, the defendant in *Goldstein* presented deposition testimony from an expert witness rebutting medical opinions given by the state's experts. See id. at 7-8 (3) (b). We held that trial counsel's failure to investigate the issues raised by the state's experts and to "seek and present expert testimony to rebut that presented by

the [s]tate was a crucial omission." Id. at 8-9 (3) (b). We noted that, "[b]ecause trial counsel did not call a single expert witness to testify for the defense, the opinions expressed by the [s]tate's expert witnesses went completely unchallenged except by cross-examination." Id. at 6 (3) (b). And we found that, "[f]or no strategic reason, the jury was left with the impression that the opinions of the [s]tate's expert witnesses were unassailable." Id. at 8 (3) (b).

(a) *Proffered testimony of defense expert.*

At trial, the state presented opinion testimony from several witnesses. Trial counsel presented no expert testimony. As in *Goldstein*, McNeil supported his motion for new trial with expert testimony that could have been introduced at trial.

Much of the state's expert testimony at trial was focused on whether the jury should believe J. D.'s exculpatory 2012 interview or her inculpatory 2014 interview. J. D. had been asked in a 2012 forensic interview if McNeil had sexually molested her. She replied that he had not. But in a 2014 outcry and subsequent forensic interview she reported that he had molested her and had been doing so well before 2012.

The state's forensic interviewer provided expert testimony on forensic interviewing, evaluation of victims of sexual abuse, delayed disclosures, and the

24

dynamics of child sexual abuse. She opined at some length on the reasons why a child like J. D. might initially fail to disclose abuse. The forensic interviewer also opined that J. D.'s statements in the 2014 interview concerning her failure to disclose the abuse earlier and her behavior in that interview were consistent with her having been abused, and she opined that there was no indication in the 2014 interview that J. D. had been "coached."

J. D.'s treating psychologist also testified as an expert witness for the prosecution in matters including child sexual abuse. She also opined about the reasons for J. D.'s delayed disclosure.

And the investigating detective, who had watched both of J. D.'s forensic interviews, opined, based on his training and experience, that in the 2012 interview J. D. "was being deceptive about the sexual abuse that had occurred." The majority correctly holds, in Division 3 (c) (ii), that this testimony was objectionable.

As in *Goldstein,* "[b]ecause trial counsel did not call a single expert witness to testify for the defense, the opinions expressed by the [s]tate's expert witnesses went completely unchallenged except by cross-examination," 283 Ga. App. at 6 (3) (b), and "[f]or no strategic reason, the jury was left with the impression that the opinions of the [s]tate's expert witnesses were unassailable." Id. at 8 (3) (b).

25

Worse, McNeil's trial counsel did not meaningfully cross-examine any of these witnesses about whether J. D.'s 2014 disclosure should be believed over her 2012 denial. He did not cross-examine J. D.'s treating psychologist at all.

But at the hearing on his motion for new trial, McNeil's appellate counsel demonstrated that there was a great deal that could have been done to meaningfully challenge those experts. She "proffered . . . expert testimony [on forensic interviewing] and demonstrated that the testimony would have been relevant to the issues, favorable to [him], and otherwise admissible." *Puckett v. State*, 342 Ga. App. 518, 527 (2) (804 SE2d 648) (2017). The defense expert witness opined that there were serious flaws in the inculpatory 2014 forensic interview — particularly in light of J. D.'s earlier denial — and that there are reasons to be skeptical of J. D.'s outcry. He challenged opinions of the state's experts regarding the process of disclosure.

The expert witness testified that J. D.'s denial of abuse in the 2012 interview was significant. He did acknowledge that "the science shows that many children do not just spontaneously disclose sexual abuse. That they don't talk about it. And so nondisclosure, just not talking about it, is not uncommon. In fact, it's pretty darn common." On the other hand, he explained, "it's a different situation when a child is specifically asked about being sexually molested, and if they have been molested that

26

can often be the trigger or a trigger for them to disclose that molestation. So it's a different thing to deny being molested than simply not to disclose it[.]"

And he noted that, at that time, J. D. was living in foster care rather than the grandparents' house and would have felt "safe" to disclose the abuse.

And J. D. had spoken in an "affectionate tone" about McNeil during the 2012 interview and had indicated that she liked being baby sat by him. The expert witness found those "very positive reactions to him being mentioned" significant, even though "some victims are positive in response to their perpetrator," because here "[t]he eventual allegation was very dramatic [and alleged] a lot of physical harm."

And he deemed it significant that the 2012 forensic interview was the third time J.D. had denied abuse by McNeil.

On the other hand, the defense expert testified to several significant problems with the inculpatory 2014 interview. "[I]t is important for the interviewer to be supportive of the child especially if there's an outcry." But "interviewers should be absolutely neutral." The interviewer had asked leading questions and engaged in behaviors that, he explained, could have improperly cued J. D. to make a false allegation. Many of the specific details in J.D.'s forensic interview were "in response to the interviewer bringing up the topics." She had steered J. D. back to talking about

27

McNeil when J. D. had started to talk about being abused by her brother. The interviewer had proposed answers to J. D. when she was unsure, such as suggesting "every night" when J. D. said did not know how many times McNeil had touched her. She had used anatomical pictures, which the defense expert criticized as leading. And she had nodded "yes" while asking J.D. if anyone had touched her.

Both the interviewer and J. D.'s adoptive mother had praised J. D. for disclosing. The interviewer did so several times during the 2014 interview, including immediately before J. D. began to describe the abuse. The defense expert explained that the act of praising a child's disclosure could affect the validity of the disclosure and that the adoptive mother's praise could have reinforced a belief that abuse had occurred — even if it had not.

The defense expert witness also opined that aspects of J. D.'s behavior during the 2014 interview cast doubt on the reliability of her disclosure. Certain aspects suggested J. D. had been coached or influenced. J. D. had referred to McNeil by his first name rather than the nickname that she had used for him during her first forensic interview; and J. D. had repeated her adoptive mother's beliefs about the reasons McNeil had abused her.

In addition, the expert witness pointed to instances in which J. D. seemed to parrot back the interviewer's language, which he opined was the result of inappropriate interviewing techniques. He also pointed to substantive aspects of J. D.'s disclosure that, in his opinion, were inconsistent with the abuse she had described, such as J. D.'s statement that she felt no pain from the abuse, even though it made her bleed, and J. D.'s statement that McNeil's penis did not change when it was touched.

The expert witness expressed concern about J. D.'s memory of the 2012 interview. J. D. had been asked during her exculpatory 2012 interview if McNeil had touched her. During her 2014 interview, however, she denied having ever been asked that question. But she remembered other details of that 2012 interview.

The state thoroughly cross-examined the defense expert and elicited his agreement to several points. But the state made no effort to show that his testimony was not credible or that it should be wholly disregarded. And the trial court's order denying the motion for new trial makes no finding as to the defense expert's credibility.

(b) *Wide recognition of the importance of defense testimony about the suggestibility of child testimony.*

And indeed many courts, including the United States Supreme Court and our Supreme Court, have long recognized the validity of the defense expert's fundamental concern: child witnesses are suggestible, and improper interviewing techniques can damage the reliability of a child's statements or testimony.

The United States Supreme Court has explained that suggestive interview techniques can render child witness statements unreliable. *Idaho v. Wright*, 297 U. S. 805, 826 (III) (110 SCt 3139, 111 LEd2d 638) (1990). See also *Kennedy v. Louisiana*, 554 U.S. 407, 443-444 (IV) (B) (128 SCt 2641, 171 LEd2d 525) (2008) ("Studies conclude that children are highly susceptible to suggestive questioning techniques like repetition, guided imagery, and selective reinforcement. See Ceci & Friedman, The Suggestibility of Children: Scientific Research and Legal Implications, 86 Cornell L.Rev. 33, 47 (2000) (there is 'strong evidence that children, especially young children, are suggestible to a significant degree — even on abuse-related questions'); Gross, Jacoby, Matheson, Montgomery, & Patil, Exonerations in the United States 1989 Through 2003, 95 J.Crim. L. & C. 523, 539 (2005) (discussing allegations of abuse at the Little Rascals Day Care Center); see also Quas, Davis, Goodman, & Myers, Repeated Questions, Deception, and Children's True and False Reports of Body Touch, 12 Child Maltreatment 60, 61-66 (2007) (finding that 4- to

7-year-olds 'were able to maintain (a) lie about body touch fairly effectively when asked repeated, direct questions during a mock forensic interview')").

The New Jersey Supreme Court has recognized a "consensus . . . within the academic, professional, and law enforcement communities, confirmed in varying degrees by courts, to warrant the conclusion that the use of coercive or highly suggestive interrogation techniques can create a significant risk that the interrogation itself will distort the child's recollection of events, thereby undermining the reliability of the statements . . . concerning such events." *State v. Michaels*, 642 A2d 1372, 1379 (II) (A) (N. J. 1994).

Other decisions from various federal and state courts acknowledging the problem of a child witness's susceptibility to suggestive interviewing techniques are compiled in *Washington v. Schriver*, 255 F3d 45, 57 (B) (3) (2d Cir. 2001).

Child sexual abuse cases present heightened concerns about a child victim's susceptibility to suggestive questioning techniques "because the central narrative and account of the crime often comes from the child herself. She and the accused are, in most instances, the only ones present when the crime was committed." *Kennedy v. Louisiana*, supra, 554 U. S. at 444 (IV) (B). So it is in the case before us. While cross-

31

examining the defense expert, the state elicited his agreement that there are usually no witnesses and often no physical injuries in child sexual abuse cases.

Our Supreme Court has held that an expert witness's opinion on the reliability of a child witness's statements in a molestation case "involves an area of expertise beyond the ken of the average layman[.]" *Barlow v. State*, 270 Ga. 54 (507 SE2d 416) (1998). That Court explained, testimony that a child victim was questioned inappropriately

> represents evidence only an expert could give on matters not within the knowledge of a juror. . . . Special interviewing processes are necessary to get information from child victims, who are often immature, inarticulate, frightened, and confused about the abuse they have received. Most jurors lack the knowledge of accepted practices in interviewing child victims[.]

Id. at 54 (citation and punctuation omitted). A defense witness's expert testimony that an interviewer used inappropriate techniques — like the expert testimony that McNeil elicited at his new-trial hearing — is "a direct response to expert testimony offered by the state" on that issue. Id. at 55 (citations and punctuation omitted).

(iii) *Trial counsel's failure to consult an expert witness was not a reasonable strategic choice.*

In our review of the trial court's ruling on McNeil's ineffective assistance of trial counsel claim, "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012) (citation and punctuation omitted).

And in this case, we must apply the standard set out in *Strickland v. Washington*, that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U. S. at 690-691 (III) (A).

By that standard, trial counsel's failure to consult an expert was wholly unreasonable and entitled to no deference. He did not investigate the need for a forensic interviewing expert and offered no strategic justification for his failure to even consult one. To the contrary, he testified that he simply does not use forensic interviewing experts. In ten years as a public defender he has never asked for money for any expert or investigator. He had participated in a defense that employed a forensic expert only once — a privately retained case in which his co-counsel had wanted to use an expert. In fact he testified that his contacts at the Public Defender Standards Council "don't like to pay me my out-of-pocket expenses for transcripts."

33

Apart from his established practice of not advocating for his clients with the council, trial counsel's only substantive justification for not consulting an expert in this case was a conversation with jurors after the case in which the expert had been used at the instance of his co-counsel — and in which the jury had acquitted. So we must conclude that in this case trial counsel did not undertake a careful determination of whether he needed an expert witness.

And, as noted above, he did not engage in a thorough or sifting cross-examination of any of the state's witnesses on the reliability of J. D.'s 2014 disclosures in light of her 2012 denial, and he did not cross-examine either J. D. or her treating psychologist at all. Trial counsel did criticize the 2014 forensic interview in his closing argument, but "counsel's statements in closing argument were not evidence, as Georgia law has long held. Indeed, the trial court so instructed the jury[.]" *McKie v. State*, 306 Ga. 111, 114 (829 SE2d 376) (2019) (citation omitted). So trial counsel's closing argument did not provide the jury with *evidence* to counter testimony from the state's expert witnesses on this issue. It follows that we must conclude that this is not a case in which trial counsel had explored the possibility of presenting expert testimony but ultimately made a reasonable decision not to do so.

It is true that, in many cases, we found the decision not to consult an expert to be part of a reasonable trial strategy. But in such cases, our decisions have followed *Strickland* and examined whether trial counsel's strategy was reasonable and founded on reasonable investigation. For example, in *Lawton v. State*, 340 Ga. App. 903, 904 (2) (798 SE2d 264) (2017), we did hold that trial counsel's decision to attack a forensic interview through cross-examination rather than expert testimony was a reasonable strategy. But in *Lawton* trial counsel had engaged in a reasonable investigation.

> At the motion for new trial hearing, trial counsel testified that to determine whether he needed to hire an expert witness, he reviewed the video recordings and he had another lawyer review them independently to get another opinion. After reviewing the recordings, he and the other attorney determined that an expert was unnecessary. Counsel based his conclusion on his experience of trying these kinds of cases, his attendance at seminars on this topic, and his experience of having listened to such experts testify in other cases.

*Lawton*, 340 Ga. App. at 904-905 (2).

Similarly, in *St. Germain v. State*, 358 Ga. App. 163, 164 (1) (a) (853 SE2d 394) (2021), trial counsel had decided against calling previously retained experts after concluding the experts might not make good trial witnesses; and we held that these

35

were reasonable, strategic decisions. In *Williams v. State*, 358 Ga. App. 152, 155-156 (a) (853 SE2d 383) (2021), trial counsel had retained an expert in forensic interviewing but that expert had reached an opinion that "would not have discredited the interview"; and we held it was a reasonable, strategic decision for trial counsel not to call the expert as a trial witness. In *Haynes v. State*, 326 Ga. App. 336, 343-344 (3) (a) (756 SE2d 599) (2014), we found no deficient performance where trial counsel decided not to call an expert witness on interviewing techniques shortly after speaking with the expert, noting that "reasonable, competent trial counsel could have made the strategic decision not to call the expert based on what counsel learned in his interview of the expert. In *O'Neal v. State*, 304 Ga. App. 548, 551-552 (2) (a) (696 SE2d 490) (2010), trial counsel decided against calling previously retained experts after concluding the experts might not make good trial witnesses; and we held that these were reasonable, strategic decisions. And in *Towry v. State*, 304 Ga. App. 139, 147 (2) (f) (695 SE2d 683) (2010), trial counsel, who "had handled more than a dozen felony child molestation cases, had training in forensic interviewing, and had himself conducted interviews of children in his former career as a police officer," chose not to call an expert because he concluded from his own review of a recorded interview

36

that nothing in the interviewer's technique "had been improper or had misled [the child victim] so as to warrant the presentation of an expert."

Instead, this is a case where trial counsel did *not* investigate such testimony. And McNeil's appellate counsel has demonstrated that such testimony could have been of significant benefit to McNeil. We have found in some such cases that trial counsel rendered deficient performance. See, e. g., *McLaughlin v. State*, 338 Ga. App. 1, 11-14 (1) (b) (789 SE2d 247) (2016) (physical precedent) (trial counsel's failure to act to obtain expert witness testimony on battered person syndrome was not strategic and amounted to deficient performance where trial counsel appreciated that such evidence would support the defendant's sole defense of justification but did not further investigate it because he mistakenly believed that he could not seek to continue the trial while he procured such evidence); *Darst v. State*, 323 Ga. App. 614, 623 (2) (a) (ii) (746 SE2d 865) (2013) (physical precedent) (finding trial counsel was deficient in failing to consult with or hire an expert witness to testify that the two victims' behavior was inconsistent with having been molested by the defendant, where trial counsel "admitted that he had not made a conscious strategic decision to do so [and that] the use of an expert witness at trial simply had not occurred to him").

37

We must consider whether trial counsel's performance was objectively unreasonable — whether "a reasonable lawyer might have done what the actual lawyer did[,] whether for the same reasons given by the actual lawyer or different reasons entirely." *Shaw v. State*, 292 Ga. 871, 875 (3) (a) n. 7 (742 SE2d 707) (2013). Under the circumstances of this case there is no evidence of any reasonable strategy for not challenging J. D.'s disclosure with expert evidence. As in *Goldstein*, supra, 283 Ga. App. 1, this is a case in which pivotal opinion testimony presented by the state — on whether to believe J. D.'s exculpatory 2012 statement or her inculpatory 2014 statement — went essentially unchallenged. So the jury was left "with the impression that the opinions of [those] witnesses were unassailable[,]" id. at 8 (3) (b) — when they could have been meaningfully rebutted. So, as we held in *Goldstein*, we should hold in this case that there was no strategic reason for trial counsel's failure to present expert testimony.

2. *Prejudice.*

"[T]o prove prejudice, [McNeil] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Woods*, 312 Ga. at 410-411 (3) (a) (citation

38

and punctuation omitted). To make that determination we must "measure the evidence that should have been — but was not presented to the jury against the totality of the evidence that was presented. This requires us to consider the strength of the . . . omitted evidence, its importance in the context of the trial, and the relative strength of the totality of the evidence." Id. at 411 (3) (a) (citation and punctuation omitted). see also *Cartwright v. Caldwell*, 305 Ga. 371, 379-381 (2) (b) (825 SE2d 168) (2019); *Goldstein*, 283 Ga. App. at 8-9 (3) (b).

The majority fails to do what *Woods* requires. To the limited extent that the majority attempts to do so, it glosses over facts unfavorable to its position. And the majority elides the key point: the expert testimony that should have been presented would have challenged the credibility of all of the evidence derived from J. D.'s outcries and interview. Without the evidence so derived, the remaining evidence would have been insufficient to sustain McNeil's convictions.

And as detailed above, the defense expert would have undermined the evidence of J. D.'s outcry to her adoptive mother, which was immediately followed by her outcry to her psychologist. He pointed to indications in the 2014 interview that J. D. had been coached or influenced. He noted that J. D. had repeated her adoptive mother's beliefs about the reasons McNeil had abused her. He opined that the

39

difference in the way J. D. had referred to McNeil in the 2012 and 2014 interviews "certainly could be a reflection of her current environment and the influences there." And the doubts he raised about J. D.'s description of the abuse (the inconsistency between the violent abuse she described and her statement that it had not been physically painful and the improbability of her report that there had been no change his penis ) apply to the outcries to her adopted mother and psychologist as well as the forensic interview. In short, while the defense expert did not testify — and I would not hold — that J. D.'s spontaneous statements should be disregarded, there is a reasonable probability that his testimony would have created reasonable doubt about those statements.

The majority's prejudice analysis briefly acknowledges the defense expert's testimony but then sets it aside, declaring that the "the strength of the omitted expert's testimony and its importance in the trial was relatively weak." . The bulk of the majority's prejudice analysis simply sets out the state's case, focusing on the gravity of the criminal conduct described and giving the state the benefit of every available inference.

But the majority does not meaningfully consider whether the defense expert's testimony could have rebutted those inferences or undermined that evidence. The

importance in the trial of that omitted evidence is illuminated by a key fact the majority fails to acknowledge. All of the evidence bearing directly on McNeil's guilt or innocence of the crimes of which he was convicted is hearsay reporting what J. D. had said.

As for the strength of the defense witness's testimony. he was not, as noted above, meaningfully impeached. As a Ph.D., his credentials are superior to the prosecution experts'. His explanations were clear. He carefully avoided overstatement, and readily conceded points that were due to be conceded.

"[M]easur[ing] the evidence that should have been — but was not — presented to the jury against the totality of the evidence that was presented," *Woods*, 312 Ga. 411 (3) (a), requires us to address the credibility of the defense expert's testimony. As noted above, it was not impeached or discredited. And as detailed above, the principles and considerations he explained have been widely recognized for many years, including by our Supreme Court and the Supreme Court of the United States. Consequently there was a reasonable probability that a jury would credit that expert testimony and entertain a reasonable doubt about J. D.'s outcry and inculpatory responses.

The remaining evidence does corroborate the inculpatory evidence. Indeed it more than suggests that McNeil is guilty of one or more comparable offenses. But it would not be sufficient to sustain *these* convictions. The evidence that J. D. exhibited behaviors, particularly sexualized behaviors, suggestive of childhood trauma is some evidence that J. D. had suffered a trauma that is likely to have been molestation. But it is not evidence that McNeil was the perpetrator. The evidence that McNeil committed "another offense of child molestation . . . may be considered for its bearing on any matter to which it is relevant," OCGA § 24-4-414 (a), but it is not in itself evidence that McNeil committed the crimes of which he was convicted. It follows that there is "a reasonable probability . . . that, but for [trial] counsel's deficient performance, the outcome of the appeal would have been different." *Gramiak*, 304 Ga. at 513 (I).

It is important to remember that the probative force of inculpatory evidence is distinct from the gravity of its content. As the majority opinion makes clear, the evidence before us is dismaying and the conduct described is reprehensible. But that is all the more reason to cut square corners. We are a court for the correction of errors, a processor of process, not a fact finder. We best serve the interest of justice when we assure that the process due has been followed.

42

There is a reasonable probability that an impartial jury would have credited the defense expert's testimony and so concluded that there is reasonable doubt about the reliability of the inculpatory evidence. There is also a reasonable probability that the jury, possibly reassured by the corroborating evidence, would have chosen to believe the inculpatory evidence, notwithstanding the defense expert's testimony. But that decision is for a jury.

I am authorized to state that Presiding Judge Anne Elizabeth Barnes joins me in this dissent.

# In the Court of Appeals of Georgia

A21A1769. MCNEIL v. THE STATE.

PHIPPS, Senior Appellate Judge, concurring in part and dissenting in part.

I concur fully in Divisions 1 and 2 of the majority opinion. I agree with the majority's analysis of the scope of the appellate record and the sufficiency of the evidence. However, I disagree with the majority's conclusion that the defendant failed to demonstrate ineffective assistance of counsel. Therefore, I respectfully dissent

44

from Division 3 of the majority opinion and join fully in Presiding Judge McFadden's opinion. Finally, I write separately to emphasize that the evidence here is not, as the majority concludes, so strong that McNeil cannot prove any alleged deficiency in his counsel's performance prejudiced his defense.

The State's case rested primarily on the victim's outcry and subsequent forensic interview. There was no physical evidence. In addition, the outcry occurred several years after the alleged molestation took place, the victim denied McNeil molested her in a prior forensic interview, and, as the majority acknowledges, the living quarters where the molestation allegedly occurred "had a rotating door of children of various ages, with minimal adult supervision" and plenty of access to the victim. Given that the State presented evidence from two other girls who testified McNeil had molested them, it was vitally important to McNeil's defense that he discredit the victim's outcry and 2014 forensic interview. This was especially important in this case because the State presented a forensic interview expert to explain why the jury should believe the victim's inculpatory 2014 interview rather than her exculpatory 2012 interview, why the victim delayed her outcry, and other issues touching on the victim's credibility. This evidence went unchallenged, and challenging the evidence likely could have influenced the outcome of the trial.

45

Without the evidence derived from the victim's outcry and forensic interview, the remaining, entirely circumstantial evidence merely shows a victim with behavioral signs suggesting that she may have been molested, a defendant who had molested at least one other girl, and a chaotic household with numerous individuals who had access to the victim. That circumstantial evidence is not sufficient to prove McNeil committed the acts for which he was charged in this case. And it definitely is not strong or overwhelming evidence.

Calling the evidence strong because the circumstantial evidence was corroborated by the victim's outcry essentially ignores the fact that a defense expert would have called into question much (if not all) of the direct evidence, thereby leaving largely (if not only) the circumstantial evidence. And the circumstantial evidence, while deeply troubling, is a far cry from "strong." Put another way, to the extent that the evidence (as a whole) was strong, it was so precisely because defense counsel failed to present expert testimony to rebut the core of the State's evidence. I therefore disagree with the majority's conclusion that "the strength of the omitted expert's testimony and its importance in the trial is relatively weak" and the "strong evidence" of guilt outweighs this weak evidence.

I believe "there is a reasonable probability that, but for counsel's [failure to secure a forensic interview expert to rebut the State's expert], the result of the proceeding would have been different." *Strickland v. Washington*, 466 U. S. 668, 694 (III) (B) (104 SCt. 2052, 80 LE2d 674) (1984). Trial counsel "did not make the adversarial testing process work," and "the omitted evidence in this case is of sufficient probative value to require a new trial." *Goldstein v. State*, 283 Ga. App. 1, 9 (3) (b) (640 SE2d 599) (2006) (citations and punctuation omitted). I therefore would reverse the denial of McNeil's motion for new trial on the basis that his trial counsel was ineffective.

I am authorized to state that Presiding Judge Anne Elizabeth Barnes joins me in this dissent.